# Court of Appeals
## Tenth Appellate District of Texas

### 10-24-00224-CV

Big Creek Construction, Ltd.,
Appellant

v.

Jim Sinkule, Individually and as Parent and Next Friend of Brent
Sinkule, Carlos Cross, Individually as Parent and Next Friend of
Darius Cross, Thomas Buchak, Individually and as Parent and Next
Friend of John Buchak, and Tony Brown, Individually and as Parent
and Next Friend of Tyler Brown,
Appellees

On appeal from the
66th District Court of Hill County, Texas
Judge Lee Harris, presiding
Trial Court Cause No. CV510-21DC

SENIOR JUSTICE GABRIEL delivered the opinion of the Court.

## MEMORANDUM OPINION

In this interlocutory appeal, appellant Big Creek Construction, Ltd. [Big Creek] challenges the trial court's order denying its No-Evidence and Traditional Motion for Summary Judgment, filed in this suit brought against it by the appellees, Jim Sinkule, Individually and as Parent and Next Friend

of Brent Sinkule, Carlos Cross, Individually and as Next Friend of Darius Cross, Thomas Buchak, Individually and as Parent and Next Friend of John Buchak and Tony Brown, Individually and as Parent and Next Friend of Tyler Brown. In its first issue, Big Creek contends the trial court erred in denying its summary judgment motion based on section 97.02 of the Texas Civil and Practice Remedies Code.[1] In its second issue, Big Creek argues that the trial court erred in overruling its objections to the affidavit of appellee's expert, D. Rowland Lamb. Because we conclude that genuine issues of material fact exist as to the first issue and that we have no jurisdiction to consider the second issue on an interlocutory appeal, we overrule issue one, dismiss issue two and affirm the denial of Big Creek's motion for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The event giving rise to this lawsuit was a single-vehicle accident that occurred in October 2019 on FM 2114 in Hill County, Texas. The issues on appeal concern a contract and compliance with that contract. In November 2018, appellant, Big Creek contracted with the Texas Department of Transportation [TxDOT] to recondition and repave portions of FM 2114 in McLennan and Hill County, Texas.

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. §51.014(a)(17) (authorizing an appeal from an interlocutory order denying a contractor's motion for summary judgment based on TEX. CIV. PRAC. & REM. CODE ANN. §97.002).

The TxDOT contract with Big Creek contained plans and specifications for the project. The applicable 2014 TxDOT Standard Specifications included:

b. Sequence of Construction

. . . .

4. In 2-mile roadway sections
    a. Prep and widen subgrade using excavation and embankment
    b. Reclaim existing material and spread evenly
    c. Cement treat
    d. Construct new flexible and prime coat treatment
    e. Place temporary pavement markings
    f. Place temporary seeding

5. When full roadway construction is completed, construct HMA (hot mix asphalt) over full width of roadway, backfill pavement edges as necessary.

The TxDOT contract also included Barricade and Construction Standard General Notes which made it clear which contracting party was responsible for making the decisions concerning traffic control plans, barricade development, design and use and who was responsible for performing the work according to the directives:

2. The development and design of the Traffic Control Plan (TCP) is the responsibility of the Engineer.

. . . .

4. The contractor is responsible for installing and maintaining the traffic control devices as shown in the plans. The Contractor may not move or change the approximate location of any device without the approval of the Engineer.

. . . .

9. As necessary, the Engineer will determine the most appropriate traffic control devices to be used.

10. The Engineer has the final decision on the location of all traffic control devices.

The summary judgment record contains the deposition testimony of Josh Voiles, the TxDOT area engineer for the area where this accident occurred. He identified the site of the accident as a bridge referred to as Brushy Creek STR 014. He acknowledged that there was some guardrail damage on bridges included in this job, but nothing that required replacement of the rail itself. He also explained that when there was "guard fence damage, it's a best practice to - - install some type of delineation or notification, whether that's barrels or cones or sometimes a sign." Voiles testified that Eric Hudson was the TxDOT inspector on this project who served as the "day-to-day eyes and ears on that job." Voiles described the allocation of responsibilities between the engineer, the inspector and the contractor. He detailed that the TxDOT inspector is someone "trained and certified in traffic control inspections." He explained that Hudson would "drive" the project to inspect for safety issues. When one was identified, if it was something "standard," such as the need for installation of barrels, then the inspector could direct the contractor to perform that task on behalf of the engineer.

Voiles also testified concerning documentation used by inspectors when they did their daily inspections. He explained that a daily work report [DWR] would be generated by an inspector that would document the "general work that's going on." Voiles was shown a DWR for the four days preceding the accident. On the DWR for October 1, 2019, there was a notation that directions were given to install guardrail damage "*signs* where SGT is sagging at guardrails on Brushy Creek STR 014." (emphasis added) Voiles was shown the DWRs from the days following October 1st, but preceding the accident, and from his review, it appeared as though the inspector was looking at the guardrails daily and made no notations that there was any further issue with the sagging guardrail. He also expressed that the reports did not reflect any indication that the directions of October 1st had not been complied with. However, Voiles did point out a compliance issue on a separate concern. He acknowledged that on October 4th there were "similar directions" to remove the windrow material under the guardrail as given the day before.

Voiles explained that TxDOT had a Work Zone Awareness review team that would pick "a couple of random jobs a month" to serve as an extra set of eyes on a job to look for minor issues. This team would prepare a report that TxDOT would then share with the contractors to get issues resolved that had not been resolved. When presented with a Work Zone Awareness team report

dated October 2nd, Voiles testified that the report showed no indication of any issues with Brushy Creek STR 014 on that date.

Voiles was shown pictures of the bridge at Brushy Creek STR 014 taken after the accident on October 5, 2019. He agreed that the pictures depicted orange barrels with white reflective stripes at each end of the bridge. Voiles explained that the intent of orange barrels is to "delineate that there is something there . . . ." He stated that "[o]range is like a standard like traffic control color, orange and white, barrels, signs, cones. It's typically a work zone."[2]

After that acknowledgment, the following colloquy occurred:

Q. [By Big Creek's attorney]: Based upon the DWR summary and your knowledge of the contract – and these barrels, can you tell us whether or not Big Creek was complying with the contract requirements?

A. Yeah, I would – I would – say the fact that they got the barrels out there like – obviously, I don't know – there was nothing in the DWR continuing to say that the work was completed. But since there was nothing continually going on, I would say that that's the expectation of my inspector, that it was met and that they got out there something. So I would say that they were meeting the requirements of the inspector that was on the job. If not, I think we would have – he would have continued to – to request something additional.

---

[2] Voiles referred to the Manual on Uniform Traffic Control Devices for Streets and Highways promulgated by the Federal Highway Administration of the U.S. Department of Transportation as his source for what the color orange meant.

In the same photographs Big Creek's attorney directed Voiles to review, there was depicted "material that the inspector was asking be removed from along the guardrails." Voiles confirmed the "material" was present in the photograph taken the day of the accident. Voiles explained that the material was what was referred to as a windrow. He clarified that a windrow was created when the crew would be "working through the sequence of operation" which would necessarily result in "windrows like we saw in those photographs" forming under the guardrails on the side of the road. The material would be the result of the pulverization of the existing roadway and the reclamation of flexbase material that was to be spread evenly at the side of the road. This windrow material would then be used at the end of the process to help backfill pavement edges to eliminate a drop off at the edge of the road.

Voiles also testified that while working through the sequence of operations, the windrows were an expected result of this type of flexbase work. He explained that the photos showed yellow reflective tabs or yellow delineators going down the center line of the bridge that appeared to serve the channelizing purpose of directing traffic from the middle of the road to the proper side lane of traffic. When asked if Big Creek was fully in compliance with the contractual conditions, even considering the windrows that existed,

Voiles opined that Big Creek was meeting all the contractual requirements at the time of the accident.

The deposition of Eric Hudson is also contained in the summary judgment record. Hudson testified that he was the TxDOT inspector on this project and responsible for preparing the daily reports. Hudson's DWR for October 1, 2019 contained a direction to Big Creek to install guardrail damage "*signs* where SGT is sagging at guardrails on Brushy Creek STR Number 014." (emphasis added) Hudson stated he probably gave the directions to the general foreman of Big Creek. Hudson agreed that it was his idea to put barrels at the end of the bridge. When asked if that was the "proper treatment" for the sagging guardrail, he responded "Yes, and signs." He also opined that the barrels were the proper treatment until the signs were available and that would have been what TxDOT would have done in a similar situation. When asked if he took any exception to any of the traffic control at the accident location that was in place at the time of the accident, Hudson responded: "There was no traffic control there for that – before the accident except for the barrels." He also explained "I think the signs came after, I do believe, I'm not sure. Couldn't – I don't know right offhand, but I think they were added right after because he asked me for them. That tells me they didn't have them."

On the October 3rd DWR, Hudson gave directions to "remove builtup flexbase under[ ] g[ua]r[dr]ails and sides of roadway for proper drainage if rain comes as predicted." The same directions were repeated on October 4th, the day before the accident. When asked the reason why he gave directions to remove the flexbase material on the side of the road, Hudson agreed that the DWR noted concerns about proper drainage due to anticipated rain.[3] He also acknowledged that windrows were typical in a project such as this. However, when questioning was pursued by asking whether he had any other concerns about the material along the side of the road, Hudson answered: "No. We just – we want it off the road. . . . But I just wanted it off the side of the road." Similar directions were repeated three days after the accident — on October 7th, 2019 — however the reference to concerns about rain was omitted. It is undisputed that the flexbase material or windrow was not removed prior to the accident.

Seth Nichols was Big Creek's Project Superintendent for this project. He confirmed that he received information from Hudson on October 1, 2019 concerning a sagging guardrail and to address this, Nichols placed two barrels at each end of the guardrail. Nichols testified that Big Creek's crews moved further down the road on October 2nd and no other traffic control was set up

---

[3] It is undisputed that there was no rain and no pooling of water that could have contributed to the accident on October 5, 2019.

before the accident at the bridge occurred. Nichols acknowledged that Hudson gave directions to get the windrow off the roadway and conceded that the crew "just hadn't got to that particular bridge yet." When questioned as to whether the windrow under the guardrail could create a safety hazard, Nichols testified that it "could." When he was shown a photograph of the windrow under the guardrail at Brushy Creek STR 014, he stated he did see that the buildup of windrow material spanned from the ground to "near the top of the guardrail" and agreed that condition could operate as a "ramp" that could defeat the purpose of the guardrail—which was to divert a vehicle if it makes contact with the guardrail and to keep it from going into the creek— and instead could result in a vehicle going over the guardrail into the creek below.

The testimony of Greg Amber, Big Creek's corporate representative, is also contained in the summary judgment record. Amber stated that when Big Creek was directed by TxDOT to put up signs to delineate the sagging guardrail, they instead put up barrels until they got the signs. He also testified that Big Creek was directed to remove the windrow on October 3rd; however, he agreed that the photographs depicted that it was not done prior to the accident. After acknowledging that Big Creek had a safety department for their projects, Amber was asked if TxDOT or Big Creek noticed a safety issue,

his company would take "immediate action because that's what [Big Creek has] been instructed to do, correct?" Amber responded: "Absolutely."

In the early morning hours of Saturday October 5, 2019, sixteen-year-old Tyler Petter was driving his 1997 Dodge Ram 3500 pickup on FM 2114 in Hill County; a location within the work zone designated in the contract. Petter had four other teenage boys as passengers — John Buchek, Brent Sinkule, Darius Cross and Tyler Brown. Petter struck the guardrail at Brushy Creek STR 014 and then went over the guardrail causing his vehicle to land upside down in a culvert in Brushy Creek below. The underlying case is a negligence action arising from personal injuries sustained by the passengers due to alleged hazardous conditions created by Big Creek as well as Big Creek's failure to sufficiently warn drivers of the construction or the dangerous conditions on the roadway.[4] The appellees have alleged both negligence and gross negligence against Big Creek.

The appellees allege in their personal injury lawsuit that the guardrail on the bridge where the accident occurred was damaged to such a degree that it stuck out into the roadway, creating a dangerous condition that resulted in the accident. The appellees also claim that the flexbase material or windrow under the guardrail created a dangerous condition because it served as a ramp

---

[4] Tyler Petter, the driver of the pickup, was initially brought into the lawsuit by a third-party petition of Big Creek. His alleged conduct has no bearing on the outcome of this appeal.

which caused the pickup to be directed over the guardrail rather than back into the roadway. The appellees claim that there were no barrels or other traffic control devices to give notice of these dangerous conditions at each end of the bridge on the morning of the accident. The appellees maintain that there was insufficient notice of the hazardous conditions which were created by Big Creek.

Petter gave differing accounts of how the accident occurred. When he first called 911, he simply told the operator that he had gone over the guardrail. When he spoke to the trooper at the scene of the accident, he recounted that he hit a pothole, lost control and then hit the guardrail and went over. In his deposition testimony, Petter stated,

> [he] hit the front right wheel of the truck on the guardrail that was sticking out. And – which caused the steering to break. And once that happened, the rear dual hit the guardrail and caused me to come up on the guardrail and I had no control, and we kept going down the rail and went off and hit the embankment on the other side.

When asked if he remembered if there were barrels at the end of the bridge, he responded "I never saw none."

In his deposition, John Buchak testified that he remembered,

> looking up and seeing the yellow and black stripes on the guardrail, and, like – I just remember us hitting it and the guardrail was bent. I would say, like, a quarter of the way in the road it was bent, and I remember it just being turned and, like – I just remember us hitting it and then riding the guardrail.

In his affidavit, Jim Sinkule stated that he drove the area of road where the accident happened "almost every day." He averred that he would have driven in that exact area a day or two before the accident and that while he had seen "damage to the guardrail," he had not seen barrels at the end of the bridge or cones on the roadway to warn motorists of the guardrail damage. Sinkule received a phone call early on the morning of October 5, 2019 telling him about the accident. He specified that he arrived at the scene of the accident at approximately 6:15 to 6:20 a.m. and that there were no barrels at the ends of the bridge upon his arrival. When shown pictures that Big Creek assert show barrels present on the ends of the bridge immediately after the accident, Sinkule countered that they were not there. He explained that at approximately 7:00 to 7:15 a.m., he saw a Big Creek employee putting cones along the damaged guardrail and bridge.

D. Rowland Lamb is a professional engineer who was timely designated by the appellees to offer his expert opinion in this case and certain of his opinions were timely disclosed. In their response to Big Creek's Motion for Summary Judgment, appellees included Lamb's first affidavit containing his

professional opinion on multiple issues raised by the motion. This affidavit was considered by the trial court in his ruling on the defendant's motion.[5]

In his affidavit, Lamb detailed the factual background that had been provided to him to include the assertion that when the driver approached the bridge the guardrail was damaged to the extent that it was "protruding out into the roadway." He stated that he was "advised there is a conflict between the parties of whether or not the barrels were in place at the time of the incident . . . ." Lamb concluded that "[r]egardless of whether or not there were warnings . . . those warnings were inadequate to alert drivers of the actual construction and conditions of the roadway." He further concluded that when the vehicle entered the portion of the roadway where the accident occurred, the delineator cones directed the vehicle to the edge of the roadway and the windrow caused it to go over the guardrail and into the culvert below.

Based on the facts and documents he reviewed and utilizing his experience and education, Lamb made the following findings:

> a. During construction of the roadway, a windrow of excess flexbase material was stockpiled along the shoulder of the roadway abutting the guardrail. At the location of the subject crash, the windrow was less than 30 feet from the travel lanes and under the guardrail and protruded toward the travel lane.

---

[5] Big Creek objected to Lamb's report based on appellees' failure to disclose all of Lamb's opinions prior to the deadline for discovery supplementation contained in the court's scheduling order. The affidavit was filed after that deadline. The trial overruled Big Creek's objection and considered the affidavit in ruling on the motion. Big Creek's complaint about the trial court's ruling on this motion forms the basis of their second issue on appeal.

b. The height of the windrow was approximately 8 to 12 inches, which created a ramp from the roadway over the guardrail.

c. The placement and height of the windrow effectively eliminated the ability of the guardrail to contain traffic within the roadway.

d. Channelizing devices were placed along the centerline (lane line) of the roadway directing traffic to the edge of the roadway.

e. The guardrail was damaged at the time and there was no warning signs to notify the travelling public of the damaged guardrail at the time of the incident.

. . . .

h. Sheet 39 of the plans for the subject construction project, (Bates number BCC000261 and TxDOT Traffic Standard BC(10)-21) shows the recommended location and traffic control for material stockpiles. This includes:

i. Placement of the stockpiled material outside of the clear zone.

ii. Using 2 drums or a type 3 barricade at each end of the stockpile.

iii. When the stockpile is within 30 feet of the travel lanes, place[ment]   of channelizing devices parallel to the stockpile with a maximum of 50 feet spacing.

. . . .

j. Prior to the incident, TxDOT directed Big Creek to remove the windrow, and Big Creek failed to follow the direction.

Based on his factual findings, Lamb rendered the following opinions based on a reasonable degree of engineering probability:

i. The windrow of material placed under the guardrail was not properly placed or properly delineated with traffic control devices, creating a hazardous roadside condition.

ii. The effective height of the guardrail was reduced substantially by Big Creek's action in creating the windrow, which prevented the guardrail from being able to redirect the truck driven by Tyler Petter back into the roadway, as opposed to over the guardrail and into the creek bed below.

. . . .

iv. The placement of the stockpile material (windrow) did not comply with the plans or the TxDOT standards.

v. The lack of placement of channelizing devices along the stockpile (windrow) did not comply with the plans of the TxDOT standards.

. . . .

vii. Even if there were two devices placed at the west end of the subject guardrail, they would have been insufficient to channelize traffic and would not have been in compliance with the TxDOT Standards or the [Texas Manual on Uniform Traffic Control Devices (TMUTCD)].

Big Creek filed its No-Evidence and Traditional Motion for Summary Judgment on March 1, 2024. Big Creek filed its objection to the affidavit of D. Rowland Lamb P.E. on June 17, 2024. The trial court signed an order denying Big Creek's hybrid motion for summary judgment on July 3, 2024. Big Creek filed a Notice of Interlocutory Appeal on July 8, 2024. The trial court signed an order denying Big Creek's objections to Lamb's affidavit on July 18, 2024.

## II. DISCUSSION

In their first issue, Big Creek maintains that the trial court erred by denying the no-evidence and traditional motion for summary judgment based on statutory immunity pursuant to Texas Civil Practice and Remedies Code section 97.002. In their second issue, they argue that the trial court erred by overruling their objection to Lamb's affidavit and considering it in the ruling on the motion for summary judgment.

### A. Appellate Court's Jurisdiction

"Courts always have jurisdiction to determine their own jurisdiction." *Hous. Mun. Emps. Pension Sys. v. Ferrell*, 248 S.W.3d 151, 158 (Tex. 2007). "A court should only reach an issue on the merits after assuring itself of its subject-matter jurisdiction." *Tex. Right to Life v. Van Stean*, 702 S.W.3d 348, 355 (Tex. 2024).

We have jurisdiction over the interlocutory appeal from an order denying a contractor's motion for summary judgment based on section 97.002 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. §51.014(a)(17). We only have jurisdiction in a case such as this one because the statute explicitly provides appellate jurisdiction on the issue of immunity alone. *See Sanchez v. Boone*, 579 S.W.3d 526, 531 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *Baylor Coll. Of Med. V. Hernandez*, 208

S.W.3d 4, 7 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). We must strictly construe statutes authorizing interlocutory appeals because such a statute authorizes an appeal in derogation of the general rule that only final judgments are appealable. *Round Table Physicians Grp., PLLC v. Kilgore*, 607 S.W.3d 878, 887 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (citing *Tex. A&M Univ. Sys. V. Koseoglu*, 233 S.W.3d 835, 840 (Tex. 2007). For instance, we have jurisdiction over an interlocutory appeal from an order denying a plea to the jurisdiction based on an official's "assertion of immunity" under Civil Practice and Remedies Code section 51.04(a)(5), but in the same appeal lack jurisdiction to consider collateral arguments that are not based on assertions of immunity. *Sanchez*, 579 S.W.3d at 536-537.

This appellate court has jurisdiction over appellant's first issue under Texas Civil Practice and Remedies section 51.014 which reads as follows:

> (A) person may appeal from an interlocutory order of a district court, a county court at law, a statutory probate court, a county court, or the business court that:
>
> . . . .
>
> > (17) grants or denies a motion for summary judgment filed by a contractor based on Section 97.02.

Appellant's second issue is "Did the Trial Court err in overruling Big Creek's objections to the untimely, previously undisclosed opinions in the Lamb Affidavit in ruling on Big Creek's Motion for Summary Judgment?" In

the discussion on the issue, appellant strays into arguments focused on violations of the Texas Rules of Civil Procedure and ultimately asks this court to find the trial court committed error in overruling the objections and by considering the affidavit. This issue—based on the argument that an affidavit was inadmissible and thus improperly considered—is not an assertion of immunity. We conclude that under the plain language of Civil Practice and Remedies Code section 51.014(a)(17), we lack interlocutory-appellate jurisdiction over Big Creek's second issue. *See id.*

**B. Standard of Review on Issue One**

We review summary judgments de novo. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). When, as here, a party moves for summary judgment under both Rules 166a(c) and 166a(i) in a hybrid motion, we will first review the trial court's judgment under Rule 166a(i)'s standards. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If a no-evidence motion for summary judgment is proper in a case, in order to prevail the movant must first allege that no evidence supports one or more essential element on a claim or affirmative defense on which the non-movant would have the burden of proof at trial. *See* TEX. R. CIV. PROC. 166a(i). The burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to

each element specified in the motion. *Mack Trucks, Inc.* v. *Tamez*, 206 S.W3d 572, 582 (Tex. 2006).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009) (citing *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

To prevail on a traditional summary-judgment motion, the movant must establish that no genuine issue of material fact exists and the trial court should grant judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *KPMG Peat*

*Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valencia Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

### C. Applicable law

Texas law provides:

> A contractor who constructs or repairs a highway, road, or street for the Texas Department of Transportation is not liable to a claimant for personal injury, property damage, or death arising from the performance of the construction or repair if, at the time of the personal injury, property damage, or death, the contractor is in compliance with contract documents material to the condition or defect that was the proximate cause of the personal injury, property damage, or death.

TEX. CIV. PRAC. & REM. CODE §97.002.

Statutory immunity under section 97.002 is an affirmative defense. *Brown v. Const. Ltd.*, 500 S.W.3d 509, 512 (Tex. App.—Texarkana 2016, pet. denied); *Peachtree Constr. Ltd. v. Head*, No. 07-08-0020-CV, 2009 WL 606720, at *3 (Tex. App.—Amarillo Mar. 10, 2009, no pet.) (mem. op.). The party asserting an affirmative defense bears the burden of pleading and proving its elements. *Quantum Chemical Corp. v. Toennies*, 47 S.W.3d 473, 481 (Tex. 2001). An affirmative defense is a denial of the plaintiff's right to judgment even if the plaintiff establishes every claim in the pleadings. *Walzier v. Newton*, 27 S.W.3d 561, 563 (Tex. App.—Amarillo, no pet.)

**D. No-evidence motion for summary judgment**

Big Creek filed a no-evidence motion for summary judgment on their own "claim," the affirmative defense contained in section 97.002. "A defendant urging summary judgment on an affirmative defense is in the same position as a plaintiff urging summary judgment on a claim." *Nowak v. DAS Investment Corp*. 110 S.W.3d 677, 680 (Tex. App.—Houston [14th Dist.] 2003, no pet.) "Thus, a defendant urging summary judgment on an affirmative defense must come forward with summary judgment evidence for each element of the defense." *Id*.

Nevertheless, Big Creek's hybrid motion contained six no-evidence points, four of which might be relevant to this appeal:

> 1. There is no evidence that Big Creek had actual knowledge of any dangerous condition at the Incident Location prior to the Incident.
>
> 2. There is no evidence that the traffic control at the Incident Location was other than the signs and barrels at the end of the guardrails that TxDOT approved.
>
> 3. There is no evidence that the traffic control at the Incident Location failed to satisfy TxDOT's inspections throughout the days before the Incident.
>
> 4. There is no evidence that the traffic control at the Incident Location failed to meet TxDOT's inspection prior to the Incident.

Under Texas procedural rules, a defendant cannot use a no-evidence motion for summary judgment to establish an affirmative defense. *Haver v.*

*Coats*, 491 S.W.3d 877 (Tex. App.—Houston [14th Dist.] 2016, no pet.). "Although a plaintiff may move for no-evidence summary judgment on the ground that there is no evidence of one or more essential element[ ] of an affirmative defense that the defendant alleged and has the burden to prove, a defendant must file a traditional motion for summary judgment if it wishes to establish each element of that defense as a matter of law. *See FDIC v. Lenk*, 361 S.W.3d 602, 609 (Tex. 2012). *See* The Honorable Judge David Hittner & Lynne Liberato, *Summary Judgments in Texas*, 54 *Baylor L.Rev.* 1, 62 (2002) (stating that "[a] party may never properly urge a no-evidence summary judgment on the claims or defenses on which it has the burden of proof"). If we were to allow Big Creek to prevail on the no-evidence portion of their motion for summary judgment, it would be the same as allowing a movant to prevail on traditional motion for summary judgment without proving its claim as a matter of law. We cannot allow Big Creek to prevail on the no-evidence portion of their motion for summary judgment. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985).[6] The trial court did not err by denying the no-evidence portion of the motion for summary judgment.

---

[6] Even if we were to consider Big Creek's no-evidence issues as briefed, as detailed above and discussed below, appellees presented evidence that raised a genuine issue of material fact which also precludes granting their motion on each of the points listed herein.

## E. Traditional Motion for Summary Judgment

When a defendant moves for a matter-of-law summary judgment on an affirmative defense, it must plead and conclusively establish each essential element of that affirmative defense, thereby defeating the plaintiff's cause of action. *See Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995); *Centeq Realty Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). "A defendant who . . . conclusively establishes an affirmative defense is entitled to summary judgment." *Big Creek Constr. Ltd. v. Sustaita*, No. 10-25-00033-CV, 2025 WL 2170348 at \*2 (Tex. App.—Waco July 31, 2025, no pet.). If the movant carries this burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *Id; See Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valencia Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

Big Creek repeatedly refers to the evidence they argue supports their traditional motion as "undisputed." Labeling it as such does not make it so. The disputes in the evidence are laboriously detailed above. We conclude that appellees' evidence, which we must consider as true, defeats Big Creek's claim.

Having found that we have no jurisdiction to consider Big Creek's second issue, we look at the same evidence that the trial court considered. The Lamb affidavit addresses issues Big Creek claims are undisputed and his opinions create genuine issues of material fact concerning whether Big Creek is protected by statutory immunity under section 97.002 of the Texas Civil Practice and Remedies Code. Appellees' Third Amended Original Petition alleged that Big Creek's negligence included inadequate striping of the road as well as failure to place adequate reflectors, cones, barrels, signs or warning devices to give notice of the dangerous conditions on the road. They also alleged that Big Creek failed to "remove the debris along the inside of the guardrail." The evidence is undisputed that Big Creek was instructed prior to the accident by TxDOT Inspector Hudson to remove the windrow from under the guardrail at Brushy Creek STR 014. It is also undisputed that the DWR for the day before the date of the accident repeated the instruction, as did the DWR for October 7, 2019, three days after the accident. Big Creek's Project Superintendent Nichols testified that the crew had not performed the requested work at the time of the accident. Even Big Creek's corporate representative testified that the windrow was still present at the time of the accident. Nichols also conceded that the windrow could have the effect of defeating the purpose of the guardrail—to direct vehicles back onto the

roadway—and instead could operate as a ramp to direct the vehicle over the guardrail. Lamb opined that within a reasonable degree of engineering probability that "the placement of the windrow and the lack of placement of channelizing devices, and the failure of Big Creek to follow the plans and directions of TxDOT, were all proximate causes of the vehicle going over the guardrail and into the creek bed."

Another alleged "undisputed" fact asserted by Big Creek concerned the presence of barrels placed at each end of Brushy Creek STR 014 before and on the day of the accident. We recognize that there was evidence to show that there were barrels in place, but there was also testimony disputing the presence of barrels. This creates a fact issue on a genuine issue of material fact.

Viewing all the evidence in the light most favorable to appellees, we conclude that reasonable people could disagree regarding whether Big Creek substantially complied with the contract conditions that would warrant an immunity defense under section 97.002. The trial court did not err when it denied Big Creek's traditional motion for summary judgment under section 97.002. *See Austin Materials, LLC v. Rosado for Troche*, No. 03-22-00201-CV, 2023 WL 3666107, at \*6 (Tex. App.—Austin May 26, 2023, pet. denied) (mem. op.). We overrule issue number one.

## F. Conclusion

We dismiss Big Creek's second issue on appeal because we lack interlocutory appellate jurisdiction over that issue.  Having overruled Big Creek's first issue on appeal, we affirm the trial court's order denying Big Creek's hybrid motion for summary judgment.

LEE GABRIEL
Senior Justice

OPINION DELIVERED and FILED:  January 29, 2026

Before Chief Justice Johnson,
     Justice Smith, and
     Senior Justice Gabriel[7]
Affirmed
CV06



---

[7] The Honorable Lee Gabriel, Senior Justice (Retired) of the Second Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Texas.